for the record, Tony Gallagher, federal defender for the District of Montana, representing Shane Birdsvil. This case was tried below by Melissa Harrison, then an assistant federal defender in my office. She is now an assistant federal public defender in Kansas City, Kansas, and I've been instructed that I better do well. Your hearing about here is cumulative error. We have raised in our blue brief seven issues, five of which I will discuss at length today. If the court has any questions about the Brady violation and the sanctions that should have been imposed, or about the sufficiency of the evidence, I will be glad to answer them. My focus, however, will be on the aggregate mistakes made during the course of the trial by the trial judge, which rendered Shane Birdsvil's trial unfair. Your Honor, just before we part forever with the Brady issue, to make sure there's not something there I'm missing, but I thought that issue didn't go anywhere because the evidence was before Birdsvil long before his trial started. That's true, Your Honor, and the record reflects that Ms. Harrison, searching a file in a different Birdsvil case, discovered the 302 involving the matters that we claimed were in violation of Brady, and certainly that was 75 days before trial. We had plenty of time to investigate that matter, and we also utilized that particular report and the information therein during the course of cross-examination. The point here is that, and we are not pointing our finger at Mr. Dennis. Yes, but even if it's wrong or it's a mistake, if there's no prejudice from it, it doesn't really matter because it got out before the trial. I think, Your Honor, what we have here is that was just an example of some of the things that occurred during the course of the trial. There were also, in addition to the Brady violations, a number of late discovery issues, things that were brought to our attention literally at the last moment, and during the course of the trial, certainly that happened on the last day when there was a document that was presented to us. Now, Judge Lovell did not admit that, but that was something that was brought to us on the last day. Why don't you just get into whatever issues you wanted to stress. Thank you very much, Your Honor. This case was tried two times, and I think that the reason that that is important is because when we look at the two trials, there are some significant differences. And I'm going to make reference to those errors and how they applied in the second trial when I discuss that second trial. We can't put our blinders on. In this whole case, in context, shows the magnitude of the trial court's erroneous rulings, its failure to limit harmful and prejudicial evidence in violation of 404 and 403, the unconscionable failure to allow psychological testimony or even hold a Daubert hearing to determine whether or not Dr. Stellati should testify. And even after, both parties asked the trial judge to hold a Daubert hearing. Your Honors, our reluctance to sanction the use of evidence of other crimes stems from the underlying premise of our criminal justice system, that the defendant must be tried for what he did, not who he is. That concept from United States v. Herrera cited in our blue brief at page 35 is at the heart of Shane Birdspiel's appeal. That same concept runs to the Stellati testimony that I referred to just a moment ago as well, because the defendant should have been able to offer a defense to the government's proffered evidence of propensity to commit pedophilic acts. The district judge allowed other acts of evidence pursuant to rules 413 and 414, at least in one respect, to counter the idea that Shane was a normal, sexually active heterosexual. But the trial court would not allow the defense to present evidence that he was a normal heterosexual through an expert and wouldn't even hold a Daubert hearing. With respect to that issue, Your Honor. Didn't his opinion, his written opinion, thoroughly analyze the Daubert factors? He did analyze the Daubert factors. And as a matter of fact, he analyzed them in detail using information from other cases where Daubert hearings were held. And, Your Honor, it was a simple – it would have been a simple thing to have the Daubert hearing. Dr. Stellati was available. Ms. Harrison. But would it have made any difference? If he analyzed all the factors, would having the hearing have made any difference? We think it would have made a difference. We think that Dr. Stellati could have established a basis, scientific basis, by which the ABLE test would have been certainly shown that it was accepted and certainly that there was a scientific background for it and accepted by peers in the scientific community. That was not allowed by Judge Lovell. He did not permit the Daubert hearing, despite the fact – if the Court will excuse me. As indicated in the transcript, there are four references during the course of the argument with regard to whether or not Dr. Stellati should testify that the parties both requested the Daubert hearing. The defense did so at ER 796, 800, and 804. And the government did so at 803. Counsel below had made a strategic decision between the first and second trial. And that strategic decision was, based on what the government had presented, this evidence that our client was a pedophile, that now I've got to find evidence to show that our client is not a pedophile or doesn't have pedophilic tendencies. Dr. Stellati performed the test. He performed an examination. And as quickly as we possibly could under the circumstances, we offered to the Court and to the government a synopsis of Dr. Stellati's opinion and then offered to the government once again the report of Dr. Stellati, admittedly immediately before trial. But we can't forget the context here. This case was tried once in December, and there was a hung jury. Then we're talking about the Christmas vacation, trying to arrange for Dr. Stellati to see our client in the jail, the Court demanding that we have an order to go to the jail. We got that order. And then finally getting the government its report and getting the government the notice that Dr. Stellati would be an expert for the government or for the defense. Your Honors, this strategic decision, we feel, was very important. And Ms. Harrison offered an unequivocal concession with regard to Dr. Stellati's testimony and the questions of the Court during the course of the Daubert discussion, because it wasn't a Daubert hearing, but there was a discussion in chambers. And Ms. Harrison at page 804 says to the Court unequivocally, I certainly admit, Your Honor, I know Dr. Stellati has testified at Daubert hearings. I request that he be allowed to testify at this one. And if he doesn't know what the magic formula is, then I don't think we've met the test. Earlier in that same page, she indicates, if he cannot explain how the test works and the science behind the test, then it shouldn't be admitted. We're offering a concession to the Court there. We're saying if Stellati can't do it, then, Judge, you don't have to let him testify. The judge's response is, well, I may just let the government bring in some more 413 or 414 if you bring in Stellati. This was unclear to me, the basis for denying the Daubert hearing. The Court says that the expert wasn't there to make the proffer under Daubert. But he was. He could have been there, Your Honor. That was the thing that we had made clear to the Court. And Judge Lovell had not indicated whether or not Dr. Stellati would be allowed to testify, whether he would be called to testify, when the Daubert hearing would be scheduled. And Ms. Harrison, throughout these chambers' proceedings, had urged the judge to allow a Daubert hearing and that Stellati would be there to testify. And was the sole basis for not allowing a Daubert hearing the fact that the expert wasn't there to testify? No, Your Honor. I don't believe it was. The grounds? I beg your pardon, Your Honor? What were the other bases? The other bases were that he didn't feel the test was reliable based on cases that had been cited to him. And he also made an enormous point out of the failure of the proper notice and that Ms. Harrison had changed her mind, which trial lawyers often do when strategies become available or strategies become better set for the defense of our clients, that she wanted to have this expert available. She wanted to try to see if there was some way to counter the evidence that the government was obviously bringing in that we felt was highly prejudicial and not very probative of anything. Judge Lovell was very upset that that notice was late, that the report was late, that he was inconvenienced. Your Honors, in addition to the lack of information to clarify one thing on the Abel test, am I right, we review the district court's exclusion of that testimony for an abuse of discretion? Yes, Your Honor. That's true. Okay. And in doing that, is there any requirement that's been established in precedent saying a Daubert hearing has to be held in the sense of an evidentiary hearing? Like if the judge looks at the theory and the judge is familiar with it or there have been other cases, is there any precedent saying the judge must in every case have testimony in a Daubert hearing? Your Honor, I don't think there's a case that exactly says that, but can I just break your question down a little bit? If certainly the judge is aware of the test, if there have been prior hearings in his court or he is aware of such hearings within the district or with other judges in that district, then I think that he can rely on their judgment, their assessment of the evidence. Here we don't have that. We don't have that at all. And as a matter of fact, we didn't have Abel, but we did have Scalati. And Dr. Scalati was prepared to testify. And although it may have delayed the trial by an afternoon, it may have even delayed the trial by a day, when we're talking about a client's constitutional right to a little price to pay. Can the judge take into account if there are other precedents saying that the test that Scalati wanted to comment on is not reliable? I think he certainly can, but that would be in his analysis of the Scalati testimony. There was no Scalati testimony. And I am not trying to mislead the Court at all, but what I'm saying is that the Court doesn't have to have the hearing. But in this circumstance, in light of the factors here, and in light of the fact that the government's evidence was admitted, we feel prejudicially that it would have been fair to allow at least an assessment of what Dr. Scalati had to say, so that we could attempt to counter that prejudicial evidence that Shane was pedophilic in some way. Did you have other evidence to counter that? Yes, Your Honor, we did. We presented the evidence of Shane's wife, Shasta, as well as two other young ladies that had dated Shane. Girlfriend. His two other girlfriends. And, of course, we also got some of that evidence out of McLean, who testified that she actually had had a sexual relationship with Shane since the time he was 16 in her home. So if it was air not to have the dabbler's hearing, why wasn't it harmless? It wasn't harmless because of the 413-414. I mean, we're talking about a balancing here of the equities. And the government is permitted to bring in 413-414 evidence to show certain propensities. Now, this case, that particular issue has been beaten to death by Montana defenders, and Granzer and LeMay stand against us. But the fact of the matter is, no matter what those cases say, we're still talking about propensity evidence. But, Your Honor, don't we – I mean, okay, you can say that. But still, don't we just apply the factors in LeMay? Oh, yes, Your Honor, you do. But what I'm saying – and I'll talk about that in a moment if I can. But when you're talking about – the fact of the matter is 413-414 allows propensity evidence. It's never been allowed before. Now it allows it. So what we're trying to do is counter that propensity evidence. Give us a break here. Allow us to bring in as much evidence as we possibly can to try to counter this juggernaut that the government wants to bring against us, saying our client has had sexual relations with all these other people. And it's a very difficult circumstance for a defense lawyer to face, and the testimony of Dr. Scalati. And I remind the Court that we were making that concession. And that concession was, if Dr. Scalati cannot say what the science is, then don't let him in. But at least hear us out. Your Honors, I also would like to point the Court to two other things that occurred during the course of this trial that we feel, perhaps not standing alone, would cause reversal. But once again, when put in this pot, they aggregate to deny a fair trial. And that was Dr. Sauer's bolstering of Wade Fast Horse's testimony, his bolstering when he said he's honest and straightforward. Once again, this is not the government's fault. I think that that was a blurt by Dr. Sauer. And it's certainly not on the record, but Dr. Sauer does this a lot. And that happened, and it was objected to, and the District Court did nothing. Then later in the trial, we have Officer Boyd, Criminal Investigator Boyd, testifying about matters with regard to St. Shane, strike that, Sage Blue Horse, and his report of events that supposedly occurred between him and Shane in Birdsville. And that particular problem for the government has now been condemned by the United States Supreme Court. I have not submitted a 28-J letter, but I can't be blind to the fact that Crawford v. Washington was recently decided, and Crawford v. Washington says that some amorphous hearsay rule that relies on reliability can't be utilized to allow such evidence to come in. Your Honors, I'd like to save the remainder of my time. But before I leave the podium ---- I beg your pardon, Your Honor? Was that objected to in this record? Yes, Your Honor, it was. I'd like to save the remainder of my time, but in my conclusion of this portion of my argument, I would just like to borrow a phrase from the government's statement that the numerous errors in this case are inextricably intertwined to the level of the unfair trial. Thank you, judges. May it please the Court, and good morning. My name is David Dennis. I'm an assistant United States attorney in the District of Montana, and I tried this case twice. I'd first like just to comment briefly on the comments made by counsel regarding the discovery violations. I believe full discovery was made in this case by September 20th, which was well in advance of the first trial, which was held on December 3rd ---- December 2nd, excuse me, and certainly in advance of the second trial, which was held on January 13th. The item that counsel was referring to, which was disclosed on the last day of trial, was a document that was offered as rebuttal evidence in our rebuttal case. That had not been provided before because we didn't anticipate needing it. In fact, we didn't even have it until the day before. With that said, the United States disagrees, obviously, with appellant's argument that there was accumulation of errors here that requires reversal because the United States doesn't believe that there was error here. There was error either in the rejection of Dr. Scalati's testimony, that there was error in allowing the 413 and 414 evidence, or in allowing the evidence of violent acts that Shane Birdsville had engaged in during the course of living with Michael Lane and living with the victim here, Wade. Since the Court seems particularly interested in the ABLE assessment of sexual interest, I will address that specifically. The Court, I believe, asked, and I forget which justice asked the question, asked whether or not a Daubert hearing is required. I did some legal research on that particular issue, and I apologize to the Court that I didn't write down the case law, but I did discover that a Daubert hearing is not required. I had not planned to use that case because I had not cited that case in my brief, and therefore I didn't make a notation of the site. But the case law in the Ninth Circuit is that a Daubert hearing is not required. In this case, the district court judge went through an exhaustive analysis of the Daubert factors in his order, and he may not have relied upon the testimony of Dr. Scalati, but he relied on something that the government thinks is even better. He relied on statements that had been made previously in Daubert hearings, in letters to the editor of sexual abuse magazines, in other journal articles published by Dr. ABLE about his test. Those are the references that the Court relied on in making its determination that the ABLE assessment of sexual interest was not reliable enough and was not relevant to the issues presented in the case. With respect to relevance, the Court determined that from Dr. ABLE's own statements that this was not a diagnostic tool. It's a tool used for treatment. And Dr. ABLE himself had stated that he never claimed that the ABLE assessment could be used to screen pedophiles from non-pedophiles, and that's exactly what the defendant would have been asking the jury to believe in offering the results of this test, and asking the judge to believe in allowing the test results to be. The statement that it couldn't be used to screen pedophiles from non-pedophiles was where, from another hearing or from a letter or from where? I would have to refer to the order, Your Honor, but I believe it was in the letter to the editor of – it was a sexual abuse journal. It's on page 7 of the order, the judge's order, where you'll find that reference. In addition to that, other courts, the Eighth Circuit Court of Appeals, has found that it's not relevant specifically in cases where the victims are Native Americans because the slides that are shown on the visual recognition part of the test don't include Native American children. They include only Caucasian children and African American children. The Eighth Circuit, which is the only circuit that has actually taken a look at the ABLE assessment test, has ruled that it wasn't relevant for that particular reason alone in cases involving Native American children, and rejected it on that basis alone. But there are plenty of other reasons to reject this test as well. Well, I, you know, I think I'm the one who asked the question about whether a Daubert hearing had to be held. And I'll take a look at our precedents, but, you know, if there are good reasons, and I see what the district court said at page 7 and throughout his order, if there are really good reasons why the district court doesn't think it's reliable, then I wouldn't think our law would require a separate hearing. But I'm not sure of that, so I'll be looking for that precedent that's not in your brief, and we'll find it. There's no problem. But maybe you could help me understand the case further. Yes, Your Honor. And just let me give you a little bit of background here. The United States had a number of other acts which we had proposed to introduce. Did you use those in the first trial?  The same evidence in the first trial as we did in the second trial, Your Honor. The decision that you were going to – well, the judge made the decision that 2 would be okay and not violate 403, but 4 would violate it. That's correct, Your Honor. Although I will say that twice the judge intimated, and I don't have the references in the record, but twice the judge intimated that had he known that the defendant was going to testify and take the stand and deny that he had engaged in the acts, that he may have allowed additional testimony or evidence as to additional victims. We chose not to push that envelope, Your Honor, just out of an abundance of caution, quite frankly. The judge went through an exhaustive analysis under LeMay of both the 413 evidence and the 414 evidence. The 414 evidence would have been the evidence regarding the sexual abuse of Sage Bluehorse. And then the 413 evidence would have been the sexual assault of Erica Runs Above. And the judge determined that under the LeMay factors that that evidence was admissible. And not only did the judge analyze the LeMay factors, but the judge looked at LeMay and analyzed the acts under those additional factors as well. So if you look to the record, you'll see that there is truly an exhaustive analysis of the LeMay factors and whether the evidence is admissible, relevant, and whether or not it is unfairly prejudicial. Certainly the evidence was prejudicial. The question here is whether it was unfairly prejudicial. And the evidence with respect to Erica Runs Above was offered to corroborate Wade's testimony that he was afraid of Burtsville, Shane Burtsville. He was afraid his mother would be killed. Exactly. Exactly. This is a case where we had a child who had once previously, during a previous investigation, had denied that he was being sexually abused. There was an 18-month delay in his reporting of the abuse. And we had no physical evidence. And he testified that he was afraid to disclose because Shane had threatened to kill his mother. And when you think about a threat like that to a young boy, a young boy might, if he threatened himself, might make the decision to go ahead and disclose and risk a threat to himself. But, you know, having three boys that age, I know that the one person that a young boy will not jeopardize their safety is his mother, is his mother. And we needed that testimony of Erica Runs Above to corroborate his testimony that Shane Burtsville had threatened his mother. And Erica Runs Above testifies that when she was raped by Shane Burtsville, by the appellant, that he told her not to tell anybody. And if she did, that he would kill her mother. It corroborates that testimony. The testimony of Sage Bluehorse corroborates other aspects of the case. Well, maybe this is leaping ahead, but so Sage Bluehorse testified at trial, gets off the stand, presumably leaves the courtroom, and then you have a police officer come testify about what Sage Bluehorse had previously said to him, so a hearsay statement. And it was ejected, too. Why doesn't that violate Crawford v. Washington? Your Honor, it's not its position that the testimony that was elicited from Officer Boyd was not offered to prove the matter asserted. But it wasn't offered as proof of ‑‑ It wasn't hearsay. Yeah, exactly. It was not hearsay. On cross-examination, Ms. Harrison had questioned Sage Bluehorse about the different stories that he had told, the different stories that he had told Officer Boyd. And when Officer Boyd took the stand, I questioned him on, okay, why did you go back and talk to Sage Bluehorse? And it may have been an error on my part to couch the question the way I did, so that he was actually testifying to what had been said before. But it was certainly not offered for that purpose. It was not offered for the truth of the matter asserted, but rather to provide background for why he interviewed Sage Bluehorse again. I hope that answers your question. Well, it's somewhat troubling to me because he is then again corroborating. The statement is pretty damaging. Certainly Sage Bluehorse's testimony is damaging. With respect to Officer Boyd's statements, he doesn't testify at length. It's a brief statement as to what Sage had told him, and then I ask the question about him going back to Sage Bluehorse to question him further and why he did that. And there was pretty strong evidence with respect to Sage Bluehorse as well. In Sage's testimony, and then there were testimony of others that corroborated Sage's testimony, which is why we chose actually that particular victim, because the evidence was very strong with that victim. So if we were to find it was hearsay, would we then go on to a harmless error analysis? I believe so, Your Honor, and I believe with the strength of the other testimony regarding Sage Bluehorse and the appellant's activities with Sage Bluehorse and abuse of Sage Bluehorse, that it would have been harmless, or it is harmless. As far as I'll owe you, if the two trials were somewhat similar, we've got hung jury in the background somewhere. It must have been a closed case once. I'll be careful in answering that question, Your Honor, but I think it is clear in the record, and I don't cite this anywhere in my brief, but repeatedly the jury foreman had discussions during that first trial with the judge and with counsel in chambers. And the jury foreman's comments were that almost from the beginning of deliberations, there was one juror who was refusing to deliberate. Sounds like the Teichol trial in New York, right? Very much so. And I will tell you that that jury hung on for a long time, a long time, and when the judge declared a mistrial, there were jurors that were visibly weeping. You're probably wise to be careful about this answer. I don't know how far we can go in saying what actually happened. I think really all we do, if we think, we have to assess whether this officer's statement is error, and then if it is, if it's harmless, and that's a determination that is based on the evidence submitted in the second trial, I don't think we have to consider the first trial. That's correct, Your Honor. Okay. I don't think we are permitted to, actually. Okay. I could move on to further discussion of the 414 evidence or the other evidence. Those issues were not addressed by defense counsel. If the Court has any questions with respect to those issues, I'd be glad to address them. Otherwise, I'd submit the case to the government. All right. Thank you very much, counsel. Thank you. Your Honors, let me initially state in answer to Mr. Dennis' final statement to the Court, I certainly don't abandon the 404B issues, nor the 413B issues. Thank you very much. And, Judge Canby, let me tell you, this was a close case. Yeah, and of course, it does go on in the second trial. I mean the second trial, but I can understand your point that you've got somebody who didn't report for a long time. There's no physical evidence. It's basically a credibility matter. It is, Your Honor, and it's not so much that there was an attack on Wade's credibility. It's an attack on his recollection, and it's an attack on his ability, if you will, to even remember what happened. I mean, there are literally pages of cross-examination in the second trial where Ms. Harrison tries to elicit the most simple of information, and Wade's answer is, I don't remember, I don't know. Those I don't remembers and I don't knows, I think, go a lot to the jury's difficulty with deciding this case. And that goes to our 413-414 analysis as well, and that at least in my reading of LeMay, one of the reasons the Court allowed 413-414 evidence in that case was because the credibility of the victim there was under attack. Read carefully the cross-examination of Wade Fast Horse in the second trial, in the first trial if you want to, because it was the same. There was not attack on his credibility. We weren't trying to impeach him. And what's interesting is that the government's only, if you will, flag with regard to Ms. Harrison's attack on credibility is in her closing argument. And if the government's going to cite to the defense's closing argument in support of the admission of 413-414 evidence, I mean, that kind of puts the cart before the horse. But be that as it may, look at her whole closing argument then, because what Ms. Harrison said to the jury was, believe Wade Fast Horse. The first time, the second time, the third time, fourth time, fifth time, sixth time he denied did anything happen. That's what we want you to believe. The other thing with regard to, and I want to address this issue because Judge Wardlaw brought it up during Mr. Dennis' argument, if I may direct the Court's attention to 773 of the excerpts of record, this is Boyd's hearsay with regard to Sage Bluehorse. Essentially, he was picked up at the residence of Nadine Baker by Shane Birdsville and Erica Runsabout. Ms. Harrison, objection, Your Honor. This is hearsay. The Court overruled. They traveled to Poplar where Erica was dropped off at her grandmother's residence and on the return trip, Shane pulled over alongside of the road, disrobed himself and Sage, and at that point had Sage masturbate him until he ejaculated. That sure doesn't sound like an assertion that's offered for anything other than its truthfulness. And, Your Honors, in conclusion, I do want to drive home one point. When you are doing any harmless error analysis and we feel that that was error, we feel that the sour statement was error, we feel that the 404B allowing Mickalene to go far afield from things that Wade observed, when you do the harmless error analysis, I would ask that you do so in the aggregate. Certainly, I would have to admit that any one of these is not sufficient and would survive a harmless error analysis. But when looked at in the cumulative, they certainly are not harmless. Thank you, Judge. Thank you very much, Counsel. U.S. v. Birdsville will be submitted and we will adjourn this session of the Court. Have a safe trip home. Thank you. All rise. The Court in this session stands adjourned. Thank you.
judges: Canby, Wardlaw, Gould